**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:17-cv-00620-WJM-STV

COLORADO *ex rel.* JULIE ANN MEADE, ADMINISTRATOR, UNIFORM CONSUMER
CREDIT CODE,

      Plaintiff,

v.

AVANT OF COLORADO LLC, d/b/a AVANT, and
AVANT, INC.

      Defendants.

---

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION TO REMAND FOR LACK OF
SUBJECT MATTER JURISDICTION**

---

**INTRODUCTION**

The Motion before the Court challenges two fundamental precepts of federal banking law: (i) the power of WebBank to originate loans, including its ability to engage a service provider to help it do so, on consistent terms throughout the United States; and (ii) WebBank's power to sell loans it originates, subject to their terms at origination. The first is of such fundamental importance to an interstate banking system that, more than 150 years ago, Congress eliminated a state's power to set interest rates below those otherwise permitted under federal law. It subsequently eliminated that same power as to state-chartered banks. The second is a core banking power of national and state-chartered banks to sell the loans they originate.

The Administrator asserts that claims brought against a state-licensed, non-bank purchaser of bank-originated loans cannot be subject to complete preemption, and, as a result, this matter should be remanded to the state court. This is simply not true. Where claims purportedly made against a non-bank assignee were in reality directed at a bank, Courts of Appeals have held that preemption is appropriate.

The attempt to argue that a loan validly made by a bank becomes invalid upon assignment to a non-bank purchaser, citing *Madden v. Midland Funding, LLC*, 786 F.3d 246 (2d Cir. 2015), is misplaced. As the United States Solicitor General and the Office of the Comptroller of the Currency stated in their amicus brief submitted in that case, "[t]he court of appeals' decision [in *Madden*] is incorrect." Brief for the United States as Amicus Curiae at *6, *Midland Funding, LLC v. Madden*, 2016 WL 2997343 (May 24, 2016) (No. 15-610) (hereinafter "Solicitor General's Brief"). If accepted, the Administrator's theory of liability would devastate capital markets given the loss of confidence in the enforceability of loans assigned to them.

1

The controlling standard for complete preemption in this Circuit—unlike the standard the Administrator urges this Court to apply—asks first whether there is a federal law that preempts the state law at issue.  In this instance, the answer is a resounding "yes."  Section 27 of the FDIA, 12 U.S.C. § 1831d ("Section 27") provides that there can be no state-law interest-rate action against "any *loan*" originated by a state-chartered bank (emphasis added).  Because WebBank originated every loan that is the subject of this lawsuit, the Administrator's claims are completely preempted.  WebBank's related declaratory action substantiates its stake in this case.

Put simply, there is no such thing as a state-law claim that the interest rates or late fees on a loan originated by a state-chartered bank violate state law.  This is true whether a state regulator sues a bank for originating a loan with an interest rate or late fee higher than the state law allows or, as here, it sues an entity that purchases loans a bank originates.  Accordingly, the Administrator's claims are completely preempted and the Motion to Remand should be denied.

## BACKGROUND

## I.     The Challenged Loans

The Administrator, apparently recognizing the removal and preemption risk of making the role of WebBank apparent on the face of the complaint, first tried to thread this needle by avoiding any mention of WebBank in the original complaint.  Perhaps recognizing that the first complaint was a bit too artful, the Administrator amended the complaint to acknowledge that WebBank originated the loans at issue.  Still, however, the effort to make WebBank invisible is palpable in how the Administrator refers to the bank as a "business entity" that is regularly engaged in the business of making loans.  Amended Complaint, ECF No. 6 ¶ 10.

As detailed in the Notice of Removal, ECF No. 1, Avant, Inc. operates as a technology service provider to WebBank, which utilizes Avant, Inc.'s online platform to make fully-amortizing installment loans for personal, family, or household purposes, pursuant to WebBank's credit policy, in amounts ranging from $1,000 to $35,000, with loan terms ranging from two years to five years, at a maximum annual percentage rate not exceeding 36%. WebBank holds all loans for a period of not less than two business days. After that period, WebBank has the option to hold those loans in its portfolio or sell them to a third-party purchaser, including Avant.

The Administrator does not dispute that WebBank may—and does—lawfully originate loans to Colorado residents and collect interest in accordance with Utah law. WebBank assigns loans to Avant, Inc. or its affiliates[1] through written agreements stating that WebBank is the lender that issues loans to consumers. Am. Compl. ¶ 27.

The agreements between WebBank and the consumers identify circumstances where a missed or partial payment will result in a $25 late or delinquency fee. *Id.* ¶¶ 21-23. The agreements between WebBank and the consumers also state that Utah law applies to the extent that state law applies to the agreements. *Id.* ¶ 24. After the loans are sold to Avant II, LLC and Avant of Colorado, LLC, they collected payments from the loans or otherwise enforced the rights permitted under the loan agreements. *Id.* ¶ 19.

Notably, the FDIC has recognized the value of marketplace lending programs like WebBank's with Avant. *See* FDIC, Supervisory Insights, "Marketplace Lending," (Vol. 12,

---

[1] Avant II, LLC is the only entity that purchased loans originated by WebBank in Colorado. The transfer to Avant of Colorado, LLC occurred after acquisition by Avant II, LLC.

3

Issue 2, Winter 2015).[2] The FDIC concluded that participating in such arrangements could be beneficial to banks as long as banks adequately addressed risks. *Id.* at 12 (requiring banks to have "proper risk identification, appropriate risk-management practices, and effective oversight" of their programs). Within the past year, the FDIC also has proposed targeted examination guidance for "third-party lending." *See* FDIC, Proposed Examination Guidance for Third-Party Lending, FIL-50-2016 (July 29, 2016).[3]   The FDIC defined "third-party lending" as an arrangement between the bank and another party where the other party performs "a significant aspect of the lending process, such as some or all of the following: marketing; borrower solicitation; credit underwriting; loan pricing; loan origination; retail installment sales contract issuance; customer service; consumer disclosures; regulatory compliance; loan servicing; debt collection; and data collection, aggregation, or reporting." *Id.* at 2. The FDIC explained that, in some arrangements, the bank does not retain the loans, "but rather holds the loan for only a short period of time before selling it to the third party . . . ." *Id.* These arrangements use "the institution's ability to export interest rates." *Id.* The FDIC may examine both WebBank and Avant in light of the relevant services provided. 12 U.S.C. § 1867(c)

## II.      The Administrator's Claims

The Administrator conducted an examination of Avant of Colorado, LLC in January 2016. Am. Compl. ¶ 36. On January 27, 2017, the Administrator filed this lawsuit, which was timely removed to federal court. Not. of Removal. In the original Complaint, the Administrator conspicuously made no reference to WebBank, claiming only that Defendants "acted as a

---

[2] Available at
https://www.fdic.gov/regulations/examinations/supervisory/insights/siwin15/SI_Winter2015.pdf.
[3] Available at https://www.fdic.gov/news/news/financial/2016/fil16050a.pdf.

'creditor' as defined in [Colo. Rev. Stat.] § 5-1-301(17)" regarding the loans at issue. Complaint, ECF No. 5 ¶ 17.   The Administrator then amended the complaint to acknowledge that WebBank issued the loans.   Am. Compl. ¶¶ 25-35. Still, in the Amended Complaint, the Administrator alleges: (i) Avant has "charged, assessed, collected, or received finance charges and delinquency charges in connection with [the loans] that exceed the finance charges authorized and allowable under [Colo. Rev. Stat.] § 5-2-201 and [Colo. Rev. Stat.] § 5-2-203." Am. Compl. ¶ 43-44; and (ii) the subject loans "purport to provide that the law of a state other than Colorado applies, in violation of" Colo. Rev. Stat. § 5-1-201(8).   *Id.* ¶¶ 44-45.   Together, these provisions of Colorado law are referred to herein as "Colorado's Interest Rate Laws."

The Administrator does not allege consumer harm or predatory lending. To the contrary, while it is undisputed that the loans at issue modestly exceed the rates that would be permitted by Colorado law if that law applied, there is no contention that the subject loans do not comply with applicable federal and Utah state laws.

## ARGUMENT

### I.      The Administrator's Claims Are Completely Preempted.

Generally, a defendant may remove a case to federal court only if "the plaintiff's complaint establishes that the case 'arises under' federal law." *Franchise Tax Bd. of Cal. v. Constr. Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1, 2 (1983); *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 392 (1987).   The "complete pre-emption' doctrine" is an "'independent corollary' to the well-pleaded complaint rule," which applies when "the pre-emptive force of a statute is so 'extraordinary' that it 'converts an ordinary state common-law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule." *Caterpillar*, 482 U.S. at 393

(quoting *Met. Life Ins. Co. v. Taylor*, 481 U.S. 58, 65 (1987)).  "Once an area of state law has been completely pre-empted, any claim purportedly based on that pre-empted state law is considered, from its inception, a federal claim, and therefore arises under federal law."  *Id.* at 386-87; *see Smith v. Aetna Life Ins. Co.*, No. 13-cv-02888-MSK-MEH, 2014 WL 2862130, at *3 (D. Colo. June 24, 2014) (stating that "[c]omplete preemption occurs when a federal statute wholly displaces state law causes of action relating to a particular issue").

In the Tenth Circuit, a case is removable under the doctrine of complete preemption when (1) "federal law . . . preempts a state law to some degree" and (2) that law "also substitutes a federal cause of action for the state cause of action, thereby manifesting Congress's intent to permit removal."  *Bauer v. United Healthcare Ins. Co.*, No. 10-cv-02057-REB-KLM, 2010 WL 4683901, at *1 (D. Colo. Nov. 10, 2010) (citing *Schmeling v. NORDAM*, 97 F.3d 1336, 1342 (10th Cir. 1996)).  The Administrator argues that there is a presumption against removal, relying on an unpublished case that the court found had been properly removed, *Anderson v. Lehman Bros. Bank, FSB*, 528 Fed. App'x 793 (10th Cir. 2013).  Plaintiff's Motion to Remand, ECF No. 28, at 4.  But the court in *Anderson* relied on *Laughlin v. Kmart Corp.*, 50 F.3d 871, 873 (10th Cir. 1995), a case that has since been abrogated by the Supreme Court.  *See Dart Cherokee Basin Operating Co. v. Owens*, 135 S. Ct. 547, 554 (2014) (expressing doubt about the "purported 'presumption' against removal").  In *Dart Cherokee*, the Supreme Court also abrogated *Martin v. Franklin Capital Corp.*, 251 F.3d 1284 (10th Cir. 2001), which the Administrator relies on for the proposition that removal statutes are construed narrowly and uncertainties are resolved in favor of remand.  Mot. to Remand at 4-5.  In short, the cases the Administrator relies on to caution this Court that the standards for removal weigh against it provide little support.

6

**A.      Section 27 Mirrors Section 85 and Provides the Exclusive Cause of Action Against State-Chartered Banks for the Alleged Charging of Excess Interest Rate.**

The predicate for Section 27 is Section 85 of the National Bank Act ("NBA"), which permits a national bank, to "charge on any loan…interest at the rate allowed by the laws of the State, Territory, or District where the bank is located," or a rate one percent above the Federal Reserve discount rate, whichever is higher, "and no more." 12 U.S.C § 85.  Section 86 establishes an exclusively federal cause of action for alleged violations of Section 85, and specifies the penalties that apply, when the terms of a national bank's loan provide for interest greater than that allowed by Section 85. Together, Sections 85 and 86 not only set a maximum interest rate that a national bank may charge (which is the maximum rate allowed by its home State), they preclude the states from imposing a lower maximum interest rate on that bank. *See Marquette Nat'l Bank of Minneapolis v. First of Omaha Serv. Corp.*, 439 U.S. 299, 314-15, 318 (1978). "To the extent the enumerated federal rates of interest are greater than permissible state rates, state usury laws must, of course, give way to the federal statute." *Id.* at 318 n.31; *see* 12 C.F.R. § 7.4001(b) (stating the same understanding).[4]  Accordingly, the Supreme Court has held that, "[b]ecause §§ 85 and 86 provide the exclusive cause of action for such claims, there is, in short, no such thing as a state-law claim of usury against a national bank," and thus, any purported application of state interest-rate law to a national bank's loans is subject to "complete

---

[4] Congress "can preempt state statutes either by an express statement of preemption or by implication." *Tarrant Reg'l Water Dist. v. Herrmann*, 656 F.3d 1222, 1241 (10th Cir. 2011). "Express preemption arises from explicit preemption language in the statute." *Id.* If "[a] state law at issue falls within the scope of [the] federal preemption provision," it must give way to federal law. *Chamber of Commerce v. Edmondson*, 594 F.3d 742, 765 (10th Cir. 2010). It is undisputed that the preemption at issue here is of the "express" variety.

pre-emption." *Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 8, 11 (2003). The Supreme Court

has extended the same rule of preemption to state-law claims about other fees and loan

arrangements that may violate state law. *See, e.g.*, *Smiley*, 517 U.S. at 741-42, 744-45.

Section 27 likewise completely preempts the application of state-law interest rate laws to

limit rates charged on loans issued by state-chartered banks. And just like Section 86, Section 27

provides for an exclusive remedial scheme for borrowers to challenge a state-chartered bank's

interest rates. *See* 12 U.S.C. § 1831d(b).  Contrary to the Administrator's contention that national

and state banks are "fundamental[ly] differen[t]," Motion to Remand at 16, Congress enacted

Section 27 for the express purpose of placing state-chartered banks on equal footing with

national banks in the credit markets, stating at the beginning of the statute that Section 27 was

needed to "prevent discrimination against State-chartered" banks. 12 U.S.C. § 1831d(a).  Its

purpose was to "provide parity, or competitive equality, between national banks and State

chartered depository institutions." *Discover Bank v. Vaden*, 489 F.3d 594, 604 (alterations

omitted) (quoting 126 Cong. Rec. 6,900 (1980) (Statement of Sen. Proxmire)).

As the District Court for the District of Utah explained in analyzing Section 27 in a

similar case also involving WebBank:

> [T]he same express preemption analysis governing Sections 85 and 86 of the
> National Bank Act applies to preemption of state usury laws under Section 27 of
> the FDIA and not only because the two provisions are 'virtually identical' in
> substance, policy, and internal logic—the same constitutionally prudential
> considerations direct the court's analysis of Section 27's preemption of the usury
> and late fee claims brought under [state] law . . . .

*Sawyer v. Bill Me Later, Inc.*, 23 F. Supp. 3d 1359, 1363 (D. Utah 2014); *see also Sherman v.*

*Citibank (S.D.), N.A.*, 679 A.2d 652 (N.J. 1996) (applying *Smiley* and holding that Section 27

allowed exportation of late fees and preempts the interest-rate limits that New Jersey law

8

imposes); *Stoorman v. Greenwood Trust Co.*, 908 P.2d 133 (Colo. 1995) (Section 27, like

Section 85, preempts state law limitations on loan fees as well as periodic interest charges).

Likewise, the FDIC has stated that "Congress [in Section 27] created a federal cause of

action that entirely replaced and protected the analogous area of state law." Brief of FDIC as

Amicus Curiae at *11-12, *Discover Bank v. Vaden*, 489 F.3d 594 (2007) (No. 06-1221), 2007

WL 551361.  Other courts are in accord.  For example, the Fifth Circuit found when interpreting

nearly identical language in a different section of the FDIA that the conditional language

emphasized "can be seen as simply providing a more exacting formulation than § 85 of

Congress's intent to aid federally insured financial institutions" and provides no basis to interpret

the statute differently from § 85. *Gavey Props./762 v. First Fin. Sav. & Loan Ass'n*, 845 F.2d

519, 522 (5th Cir. 1988) (interpreting 12 U.S.C. § 1730g(a)).  Because Section 27 preempts state

interest rates and late fee limits as to any loan a state-chartered bank issues, there can be "no

such thing as a state-law claim of usury" as to "any loan" issued by a state-chartered bank, no

matter what happens to it after its sale.  *Beneficial Nat'l Bank*, 539 U.S. at 8, 11 (2003).

The Administrator relies on the Eighth Circuit's minority ruling in *Thomas v. U.S. Bank

National Ass'n ND*, 575 F.3d 794 (8th Cir. 2009), to argue that state usury claims against state

banks are not preempted, Mot. to Remand at 17-19, but *Thomas* broke with other federal

appellate courts to hold that Section 27, unlike Section 85, does not completely preempt **all** state

usury claims.  *Cf. In re Community Bank*, 418 F. 3d 277, 295-96 (3d Cir. 2005), *Discover Bank

v. Vaden*, 489 F. 3d 594 (4th Cir. 2007).  Ignoring the express statutory language that makes

clear that Section 27 is intended to prevent discrimination against state-chartered banks, the

*Thomas* court applied a cramped reading to erroneously conclude that Section 27—unlike

Section 85—preempts only claims where the rate allowed under federal law exceeds the rate allowed by state law. *Thomas*, 575 F.3d at 799. The *Thomas* court's reading of the statute as a whole is not correct and in any event failed to apply applicable Supreme Court precedent by considering fees to be distinct from interest rates, *see Smiley*, 517 U.S. 735 at 744-45. But even if *Thomas* were correctly decided, it has no application here because the rate allowed by federal law (by reference to Utah's allowed interest rate) concededly exceeds Colorado's lower interest-rate limits on every single loan at issue in the Administrator's case.  Thus, this action is preempted by Section 27 even as *Thomas* defined it.

Finally, the Administrator misconstrues a provision in the Dodd-Frank Act, 12 U.S.C. § 25b(h)(2), to argue that Congress expressly withdrew preemption for actions against the agents of national banks. *See* Mot. to Remand at 8.  This argument is incorrect.  First, Section 25b(h)(2)'s limitation on preemption under portions of the NBA explicitly does not affect the rights of banks to charge interest.  In fact, a different subsection of Section 25b, expressly states that "[n]o provision of [the NBA] shall be construed as altering or otherwise affecting the authority conferred by section 85 of this title for the charging of interest by a national bank at the rate allowed by the laws of the State, territory, or district where the bank is located, including with respect to the meaning of 'interest' under such provision." 12 U.S.C. § 25b(f). The purpose of Section 25b(h)(2) was to limit *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1 (2007), which had interpreted the NBA and its implementing regulations to preempt licensing requirements as applied to bank subsidiaries.  *Id.* at 21.  *Watters* did not involve the power to charge interest under Section 85. Section 25b(h)(2) has no application to Section 85 or this case.  Second, even

if Section 25b(h)(2) did apply to interest rates, it is inapplicable here as Avant did not extend

loans, instead asserting preemption solely as an assignee of WebBank's loans.

### B.   The Administrator Cannot Avoid Complete Preemption by Excluding WebBank as a Defendant.

The Administrator cannot avoid complete preemption under Section 27 with artful

pleading, suing only Avant and excluding WebBank, because this action necessarily implicates

WebBank's core banking power to originate and sell loans. *See* Solicitor General's Brief, at *6;

*see also Planters' Bank of Miss. v. Sharp.*, 47 U.S. (6 How.) 301, 323 (1848) ("[I]n discounting

notes and managing its property in legitimate banking business, [a bank] must be able to assign

or sell those notes when necessary and proper . . . ."). As the Solicitor General noted that "[a]

national bank's federal right to charge interest up to the rate allowed by Section 85 would be

significantly impaired if the national bank's assignee could not continue to charge that rate."

Solicitor General's Brief, at *8. Thus, allowing state law usury claims to proceed against the

assignee of a national bank's loans would "directly interfere[] with a national bank's authority to

make and transfer loans at the permitted rate of interest." *Id.* at *9. The same applies to loans

originated by state banks. *See Hill v. Chemical Bank*, 799 F. Supp. 948, 951 (D. Minn. 1992)

("As the language and legislative history of [Section 27] make clear, Congress enacted [Section

27] to create parity between national and state banks with respect to usury limitations.").

The Administrator's insistence that the claims are "directed solely at" Avant, Inc. and

Avant of Colorado, LLC simply ignores the nature of the claims at hand. Mot. to Remand at 9.

In reality, they are directed squarely at WebBank and its core banking functions, as evidenced by

WebBank's own action against the Administrator seeking a declaration that "neither it nor its

loans, nor any entity to whom WebBank has sold or assigned its loans, are subject to Colorado's

Interest Rate Laws" to seek protection from the Administrator's action.   Complaint ¶ 92, *WebBank v. Colorado ex rel. Meade*, No. 1:17-CV-00786 (D. Colo. Mar. 28, 2017), ECF No. 1. The Administrator's tactics threaten to subject WebBank and other "state banks to the many and various state law remedies," which would undermine the express purpose of Section 27.   *Hill*, 799 F. Supp. at 952; *see also SPGGC, LLC v. Ayotte*, 488 F.3d 525, 531 (1st Cir. 2007) ("[A] state law may be preempted by the National Bank Act when it frustrates or limits the ability of a national bank to exercise its statutorily granted powers.").   Therefore, Section 27 "must be interpreted as an exclusive federal remedy for usury claims" against state banks and against assignees of state bank loans.  *Hill*, 799 F. Supp. at 952.

The Administrator acknowledges that two Federal Courts of Appeals have held state law usury claims against non-bank assignees are completely preempted, but her attempts to distinguish those cases are unavailing.  Mot. to Remand at 11-13.  In *Krispin v. May Department Stores Co.*, 218 F.3d 919, 921 (8th Cir. 2000), a national bank extended credit on credit cards issued by a department store to its customers.  The bank's credit agreements provided for late fees of $15 (which constitute "interest" under the NBA), and it sold its receivables (including any late fees or other interest) to the department store.  *Id.* at 922-23. The Eighth Circuit held that claims by delinquent borrowers that the late fees were usurious under state law were completely preempted because a court must "look to the originating entity (the bank), and not the ongoing assignee (the store), in determining whether the [Act] applies."  *Id.* at 924.  For purposes of evaluating the applicable interest rate, the "real party in interest" was the bank that originated the loans, which "issue[d] credit" and "set[] such terms as interest and late fees."  *Id.*

12

The Administrator incorrectly asserts *Krispin* is distinguishable from the present circumstances because "the bank was a wholly-owned subsidiary of the non-bank defendant." Mot. to Remand at 12. But the Eighth Circuit never identified this as a basis for its holding. Rather, *Krispin* turned on the fact there was an assignment of contractual rights. 218 F.3d at 923. In reaching its decision, the Eighth Circuit cited to *Federal Deposit Insurance Company v. Lattimore Land Corp.*, 656 F.2d 139, 147-49 (5th Cir. 1981), for the proposition that "the non-usurious character of a note should not change when the note changes hands." *Krispin*, 218 F.3d at 924. Thus, *Krispin* is directly analogous to the present circumstances and demonstrates the NBA and Section 27 completely preempt state law claims against non-bank assignees.[5]

In addition, in *Discover Bank v. Vaden*, 489 F.3d 594 (4th Cir 2007), *rev'd on other grounds by Vaden v. Discover Bank*, 556 U.S. 49, 50 (2009), a state-chartered, federally insured bank issued credit cards, and the bank's non-bank affiliate marketed and serviced the loans and collected on the accounts. In a lawsuit against the non-bank servicer for improper assessment of fees and interest charges, the Fourth Circuit held that the bank was the real party in interest, and therefore the state law claims were completely preempted by Section 27. *Id.* at 600-03. The Administrator acknowledges that the claims in *Vaden* were in reality "directed" toward the bank, Mot. to Remand at 12-13, and that is equally the case here.

---

[5] Similarly, the Administrator's citation to a provision of the Dodd-Frank Act referring to subsidiaries, affiliates, or agents of a national bank is in inapposite. Mot. to Remand at 8-9. Defendants do not argue that the Administrator's claims are preempted because they are a subsidiary, affiliate, or agent of WebBank, they are not. Rather, Defendants apply the Tenth Circuit test for complete preemption to show that the Administrator's claims are completely preempted.

Nearly all of the remaining cases cited by the Administrator to argue that claims against non-banks are not removable arise out of credit products bearing no resemblance to the WebBank loans at issue here—payday lending at triple-digit interest rates. *See, e.g.*, *West Virginia v. CashCall, Inc.*, 605 F. Supp. 2d 781, 783 (S.D. W. Va. 2009); *Flowers v. EZPawn Okla., Inc.*, 307 F. Supp. 2d 1191, 1201 (N.D. Okla. 2004); *Colorado ex rel. Salazar v. Ace Cash Express, Inc.*, 188 F. Supp. 2d 1282, 1283 (D. Colo. 2002); *Cmty. State Bank v. Knox*, 850 F. Supp. 2d 586, 590 (M.D.N.C. 2012) (interest rates in excess of 300%); *Flowers*, 307 F. Supp. 2d at 1196 (interest rates in excess of 505.38%).[6]  In one of the cited cases, the Attorney General brought fraud charges against both the bank and the non-bank. *Spitzer v. Cty. Bank of Rehoboth Beach*, No. 1:03-CV-1320 (N.D.N.Y. May 25, 2004).

Moreover, in the Administrator's cited cases, there was no suggestion that the plaintiff engaged in artful pleading to make an end run around Congress' facilitation of a national banking system. *See CashCall*, 605 F. Supp. 2d at 786-87 ("Further supporting [the] conclusion [that the state law claims were not completely preempted] is the absence of any indication that the State artfully pled its claims against CashCall, rather than the Bank, to thwart federal question jurisdiction and Congressional intent.").  In contrast, the original complaint here entirely omitted any mention of WebBank, and the amendments to the complaint strain to make WebBank's role as the lender disappear with references to an unnamed "business entity." *See,*

---

[6] *Ace Cash Express* was decided before *Beneficial National Bank*, and the United States' expressed superseding view, in *Madden*, that actions like *Ace Cash Express* and like this one are completely preempted. *See Bank of Am. v. City & Cty. of S.F.*, 309 F.3d 551, 563 (9th Cir. 2002) (finding an OCC position presented in an amicus brief "reasonable and thus entitled to 'great weight'").

*e.g.*, Am. Compl. ¶ 10 ("The Avant Loans are loans that are made or arranged by a business entity that is regularly engaged in the business of making loans.").[7]

Finally, the Administrator incorrectly claims that the issue of whether Defendants are the "true lenders" is limited to the preemption defense and unrelated to federal jurisdiction. Mot. to Remand at 14 n.5. This argument only demonstrates the extent of the Administrator's efforts to circumvent federal law prohibiting discrimination against state-chartered banks. It is undisputed that the loan agreements between the borrowers and WebBank state that WebBank is the entity making the loan. Whittaker Decl. Ex. B, ECF No. 1-12, at 1 (noting that the written agreement evidencing loans referenced in ¶¶ 21 and 24 of the Amended Complaint states "WebBank, an FDIC-insured, state-chartered industrial bank headquartered in Salt Lake City, Utah, identified above as Lender/Creditor is the lender of this loan").[8]

---

[7] In Defendants' Notice of Removal, they pointed out that the Administrator knew or should have known that the statements in a pre-sale bond report that Avant had warehouse lines for funding loans were not correct and Defendants submitted a declaration where an employee stated, under penalty of perjury, that Avant, Inc. has not funded the origination of any loan in the State of Colorado. Not. of Removal ¶ 30. The Administrator knew or should have known the bond report is not correct because she conducted an examination of Avant of CO and had access to and reviewed a wealth of documents and information relating to the compliance management and operations of the company, including the flow of funds. Am. Compl. ¶ 39.

[8] The Administrator also argues that this issue should be decided in the state courts. Mot. to Remand at 14, n.5. However, assigning such determinations to state courts could result in a patchwork of determinations—and, by extension, a patchwork of interest—incompatible with the national banking system Congress intended to facilitate. For example, a court in Utah might determine that WebBank was in fact the "true lender," *see e.g.*, *Sawyer*, 23 F. Supp. 3d 1359, and a court in Colorado could reach a different conclusion. *See also, Cmty. State Bank v. Strong*, 651 F.3d 1241, 1259 (11th Cir. 2011) (determination of "true lender" for purposes of Section 27 is an issue of "federal law"). In any event, TILA and its implementing regulations define "creditor" for purposes of consumer loans as "the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness . . . ." 15 U.S.C. § 1602(g); 12 C.F.R. § 226.2(a)(17)(i). TILA does not care whether the lender intends from the inception of the loan to "simultaneous[ly]" assign it to a third party. 12 C.F.R. § Pt. 1026, Supp.

## II.   The Valid-When-Made Rule Forecloses Application of Colorado's Interest Rates Laws to WebBank's Loans.

Section 27 expressly applies to "*any* loan" or "other evidence of debt" issued by a bank. 12 U.S.C. § 1831d(a) (emphasis added). In other words, validity attaches to the loan, not the lender.   It also preempts "any State constitution or statute"—and when Congress uses the word "any," courts must construe the term to "mean[] what it says."   *United States v. Gonzales*, 520 U.S. 1, 5 (1997).  Section 27 does not restrict its preemption by type of loan or bank operational structure, and it extends to the rate of "interest," late fees, and other charges that may turn on a bank's determination to export the interest rate laws of its home state.  *Smiley*, 517 U.S. at 746, 747, 738 n.1; *Greenwood v. Mass.*, 971 F.2d 818, 827 (1st Cir. 1992); *accord* FDIC General Counsel Opinion No. 10; Interest Charges Under Section 27 of Federal Deposit Insurance Act, 63 Fed. Reg. 19258 (Apr. 17, 1998). In other words, a loan that is "valid when made" cannot become usurious under the interest rate laws of another jurisdiction upon assignment.

When Congress enacted Section 85's earliest statutory antecedent in 1864, *see* 13 Stat. 108, it was already well-established that a bank's power to sell loans was a "necessarily implied" corollary of the power to originate loans because, "in discounting notes and managing its property in legitimate banking business, [a bank] must be able to assign or sell those notes." *Planters' Bank of Miss.*, 47 U.S. (6 How.) at 322-23 (holding that a state law that barred a state bank from transferring a loan violates the constitutional prohibition on state impairment of

I, Part I, Comment 2(a)(17)(i)-2; *see also Henson v. Bank of Am.*, 935 F. Supp. 2d 1128, 1146-47 (D. Colo. 2013) (dismissing TILA claim because assignee is not a "creditor"); *Wright v. Residential Acceptance Network*, No. 2:11CV402 DS, 2011 WL 4344179, at *1 (D. Utah Sept. 14, 2011) (noting that, even if the loan is assigned simultaneously with its creation, "the party to whom the obligation is initially payable 'is the only creditor in the transaction'" for TILA purposes).

contracts, U.S. Const. art. I, § 10, cl. 1); *see id.* at 321-25. In adopting the NBA—and, later, Section 27—Congress acted against the backdrop of, and preserved for banks, this central aspect of a bank's lending power. *E.g.*, *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 108 (1991) ("[W]here a common law principle is well established … the courts may take it as given that Congress has legislated with an expectation that the principle will apply except when a statutory purpose to the contrary is evident." (quotation omitted)).

Under the "valid-when-made" rule, if the interest-rate terms in a bank's original loan agreement were valid when made, then those terms remain valid after assignment, and the assignee may lawfully charge interest at the original rate. *See Nichols v. Fearson*, 32 U.S. (7 Pet.) 103, 105 (1833) (a "cardinal rule[] in the doctrine of usury" is that "a contract which in its inception is unaffected by usury can never be invalidated by any subsequent usurious transaction"); *Gaither v. Farmers & Mechs. Bank of Georgetown*, 26 U.S. (1 Pet.) 37, 43 (1828) ("[T]he rule cannot be doubted, that if the note be free from usury, in its origin, no subsequent usurious transactions respecting it, can affect it with the taint of usury"); *Munoz v. Pipestone Fin., LLC*, 513 F. Supp. 2d 1076, 1079 (D. Minn. 2007) (state law claim for excessive interest against loan assignee preempted).  Applying this rule in the interest-rate context, courts look to the identity of the original creditor because "[t]he non-usurious character of a note should not change when the note changes hands." *Lattimore Land Corp.*, 656 F.2d at 148-49; *Olvera v. Blitt & Gaines, P.C.*, 431 F.3d 285, 289 (7th Cir. 2005) ("[T]he common law puts the assignee in the assignor's shoes, whatever the shoe size," and allows the assignee to collect interest at the rate allowed to the originating creditor); *Munoz*, 513 F. Supp. 2d at 1079 (state law claim for excessive interest against loan assignee preempted).

The OCC agreed in a brief filed on behalf of the United States and the Office of the Comptroller of the Currency.[9]  Specifically, the Solicitor General affirmed that, "[u]nder the long-established 'valid-when-made' rule, if the interest-rate term in a bank's original loan agreement was nonusurious, the loan does not become usurious upon assignment, and so the assignee may lawfully charge interest at the original rate." Solicitor General's Brief, at *8. Accordingly, the Solicitor General concluded unequivocally that "[t]he power explicitly conferred on national banks by Section 85—*i.e.*, the power to originate loans at the maximum interest rate allowed by the national bank's home State—therefore carries with it the power to use the loans once originated for their usual commercial purposes, which include assignment of such loans to others." *Id.*  The Solicitor General expressed concern that "[a] national bank's federal right to charge interest up to the rate allowed by Section 85 would be significantly impaired if the national bank's assignee could not continue to charge that rate." *Id.*[10]  In other words, if the capital markets lack confidence that loan purchasers can enforce the terms of loans that are validly made, they will evaporate.

---

[9] The OCC's views on this matter are entitled to substantial deference. *See Bank of Am. v. City & Cty. of S.F.*, 309 F.3d 551, 563 n.7 (9th Cir. 2002) (noting that opinions of the OCC, including in amicus briefs, are entitled to deference by federal courts).

[10] The Administrator contends that the Second Circuit's decision in *Madden v. Midland Funding, LLC*, 786 F.3d 246 (2d Cir. 2015), dictates that the sale of a loan extinguishes any interest the bank may have in the loan's validity. *See* Am. Compl. ¶ 31 (citing *Madden*, 786 F.3d at 250). But, as the Solicitor General observed, the parties in *Madden* "did not cite Section 85 even once" in their briefing to the Second Circuit, let alone discuss the valid-when-made rule. Solicitor General's Brief, at *19 ("The court of appeals' failure to recognize the full scope of powers granted to national banks under Sections 85 and 24(Seventh), and the court's failure to appreciate the potential significance of the valid-when-made rule, may be attributable at least in part to the lack of clarity in the briefing."). *Madden* therefore is particularly unpersuasive with respect to the preemption issues here.

In the context of the Employee Retirement Income Security Act ("ERISA")—one of the few other areas of law subject to complete preemption, *see Aetna Health Inc. v. Davila*, 542 U.S. 200, 207-08 (2004)—courts routinely reject efforts by plaintiffs to avoid complete preemption by naming as defendants only medical professionals or third-party medical reviewers.  *See, e.g., Hackney v. AllMed Healthcare Management Inc.*, --- F. App'x. ---, 2017 WL 656752, at *2-4 (6th Cir. Feb. 17, 2017); *Hogan v. Jacobson*, 823 F.3d 872, 878-83 (6th Cir. 2016).  In *Hogan*, for example, the plaintiff sued two nurses for opinions they had offered regarding her benefits, artfully pleading her claims to avoid any reference to the insurance company or ERISA and alleging only that the nurses committed negligence by practicing without the appropriate state medical license.  823 F.3d at 877. The Sixth Circuit affirmed complete preemption, holding that Hogan's claims were, "at bottom, claims for wrongful denial of benefits under an ERISA plan that arise solely from the relationship created by that ERISA plan."  *Id.*; *see also  Hackney*, 2017 WL 656752, at *3 (finding complete preemption because the complaint implicitly relied on ERISA to establish a duty as to third-party medical reviewers).  So too here.  The instant action necessarily impairs WebBank's core powers protected by federal law, *id.*, and is "at bottom," a usury claim "aris[ing] solely from the relationship created by" Section 27. *Hogan*, 823 F.3d at 877.  Notwithstanding the artful pleading, the Administrator's claims are completely preempted.

Finally, the Administrator is simply incorrect that Defendants' discussion of the valid-when-made principle is irrelevant to the evaluation of whether the claims are completely preempted. Mot. to Remand at 14.  Rather, establishing ordinary preemption is a critical element of the test for complete preemption in the Tenth Circuit.  *See Bauer*, 2010 WL 4683901, at *1 (holding that one element of the test for complete preemption is a federal law that preempts state

law).  And, as demonstrated above, Defendants have clearly established that the Administrator's

action has been completely preempted, whereas the Administrator simply ignores the substance

of Defendants' arguments as well as the governing test in this Circuit for complete preemption.

A contrary finding would substantially undermine a core banking power of state banks.  Such

interference from the states with the powers of state banks constitutes exactly the type of action

for which Congress provided Section 27's federal cause of action to address.  *See Beneficial*

*Nat'l Bank*, 539 U.S. at 2 (finding that the cause of action created by the NBA was "an integral

part of a banking system that needed protection from possible unfriendly state legislation").  In

short, the loans sold to Avant, Inc. and its affiliates were valid when made and they did not

become usurious by operation of the assignment.[11]

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court hold the claims

raised in this suit are completely preempted and deny the Administrator's Motion to Remand.

---

[11] If this Court has any doubt as to the views of the FDIC and OCC, and particularly given that an order remanding this action would not ordinarily be appealable, *e.g.*, *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 638 (2009), Avant respectfully submits that the Court should solicit those views before entering a final order. *See Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1395 (2015) ("[I]f faced with a question that presents a special demand for agency expertise, a court might call for the views of the agency); *see also Rosado v. Wyman*, 397 U.S. 397, 406-07 & n.9 (1970) ("Whenever possible the district courts should obtain the views of [the relevant agency] in those cases where it has not set forth its views, either in a regulation or published opinion, or in cases where there is real doubt as to how the [the agency's] standards apply to the particular state regulation or program.").

Dated: April 26, 2017                          Respectfully submitted,

                                               **Buckley Sandler LLP**


                                               /s/ John C. Redding
                                               John C. Redding
                                               Valerie L. Hletko
                                               Scott T. Sakiyama
                                               1250 24th Street, Suite 700
                                               Washington, DC 20037
                                               Telephone: (202) 349-8000
                                               jredding@buckleysandler.com
                                               vhletko@buckleysandler.com
                                               ssakiyama@buckleysandler.com

                                               **Brownstein Hyatt Farber Schreck, LLP**

                                               Jason R. Dunn
                                               Richard B. Benenson
                                               410 Seventeenth Street, Suite 2200
                                               Denver, CO 80202
                                               Telephone: (303) 223-1100
                                               jdunn@bhfs.com
                                               rbenenson@bhfs.com

                                               *Attorneys for Defendants*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 26, 2017. I caused a true and correct copy of the foregoing document, titled DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION TO REMAND FOR LACK OF SUBJECT MATTER JURISDICTION, to be electronically filed with the Clerk of the Court using the CM/ECF system which will provide notification of such filing to counsel of record for Plaintiff, Julie Ann Meade, Administrator, Uniform Consumer Credit Code, listed below.

Nikolai N. Frant, #38716
Trina K. Taylor #47194
Assistant Attorneys General
Uniform Consumer Credit Code
Department of Law
Ralph L. Carr Colorado Judicial Center
1300 Broadway, 6th Floor
Denver, Colorado 80203
Phone Number: 720-508-6111
FAX Number:   720-508-6033
Email: nikolai.frant@coag.gov
Email: trina.taylor@coag.gov

*/s/ John C. Redding*
Buckley Sandler LLP